1997 ME 156

STATE of Maine

v.

Jerry YORK.

Supreme Judicial Court of Maine.

Argued Dec. 2, 1996.

Decided July 18, 1997.

R. Christopher Almy, District Attorney, Michael Roberts, Dep. Dist. Atty., C. Daniel Wood, Asst. Dist. Atty. (orally), Bangor, for State.

William N. Palmer (orally), Gray & Palmer, Bangor, for defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

DANA, Justice.

[¶ 1] Jerry York appeals from the judgment of conviction entered in the Superior Court (Penobscot County, *Mead, J.*) on a jury verdict finding him guilty of arson (Class A) in violation of 17–A M.R.S.A. § 802 (1983 & Supp.1996). York contends the court erred in allowing the State to impeach his testimony with statements obtained in violation of his Sixth Amendment right to counsel.[1] We agree and vacate the judgment.

[¶ 2] On the morning of June 25, 1993, the East Millinocket police received an anonymous telephone call informing them there would be a fire that afternoon at York's mobile home located in Medway. Later that afternoon, James Ellis, an investigator with the State Fire Marshal's Office, conducted surveillance of the home. He observed the residence for about two hours but saw nothing suspicious. The next morning York's home was partially destroyed by fire. Ellis investigated the fire and, based on evidence gathered at the scene, concluded it was set intentionally. As part of his investigation Ellis spoke with York's stepcousin. Chris Perro, who was living at York's residence at

the time of the fire. Perro stated originally that he did not know anything about the fire. In September 1993 Perro changed his story and told Ellis that before the fire York had stated he planned to burn his home and offered Perro money for his help. Perro also stated that shortly after the fire York admitted setting it. In December 1993 the State obtained an indictment charging York with arson. At his arraignment York received court-appointed counsel and pleaded not guilty.

[¶ 3] In June 1995, while York awaited trial, Perro spoke with York's attorney and once again reversed his story stating that York had not said the things that Perro told Ellis in September 1993. Perro stated York had nothing to do with the fire and explained he had lied because he was upset with York for firing him from his job at a supermarket and because Ellis threatened him by saying that unless he could prove his innocence, he would go to prison with York. Perro claimed he changed his story to implicate York because he was scared. York's attorney summoned Ellis, and Perro repeated this new version of events to Ellis. Shortly thereafter, Ellis spoke with Perro in private and Perro agreed to meet with York while wearing a hidden body wire. In July 1995 Perro wore the wire to a meeting with York during which York made several incriminating statements. Ellis, who was located nearby in a parked vehicle, recorded the conversation between the two men.

[¶ 4] At the trial, Perro testified that the true story was the one implicating York, the story Perro told Ellis in September 1993. York testified and denied Perro's assertions. On cross-examination the State used information obtained from the surreptitious recording to impeach York's testimony. The State also used the information in its rebuttal case while questioning Ellis. The jury found York guilty of arson and he appeals.

[¶ 5] As a preliminary matter, the State argues York failed to preserve certain issues for appeal by failing to file a motion to suppress pursuant to M.R.Crim. P. 41A.[2] The

---

1. The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

2. M.R.Crim. P. 41A provides in part:

State contends York failed to preserve the issues whether the surreptitiously recorded conversation resulted in a deprivation of his right to counsel and whether he voluntarily waived that right. The State contends that because a testimonial hearing was not conducted pursuant to Rule 41A, "[n]o testimony operates as a foundation upon which the trial court—or this Court—can make adequate factual findings on the merits of the claimed [S]ixth [A]mendment violation." We conclude York properly preserved the issues for appeal.

[¶ 6] Although he did not file a motion to suppress, York nevertheless placed the issues before the trial court. In his motion *in limine* York objected to the admission of the recorded information citing *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) (Sixth Amendment right to assistance of counsel violated in case in which police informant used body wire to record conversation with the defendant after the defendant's right to counsel had attached). York similarly objected at the trial on grounds that his right to counsel had been violated and that he had not waived his right. Moreover, at the trial the State conceded its actions had infringed York's right to counsel, and that such actions prohibited the State from using the recorded information in its case-in-chief. Finally, and most importantly, because York's Sixth Amendment right to counsel had attached before the recorded conversation occurred,[3] the State bore the burden of showing an effective waiver. *See, e.g., Michigan v. Harvey*, 494 U.S. 344, 354, 110 S.Ct. 1176, 1182,

108 L.Ed.2d 293 (1990) (the State has the burden to show that a waiver is knowing and voluntary). The State made no such showing, and on appeal York provides a record that is more than adequate to resolve the issue. *Cf. State v. Clark* 483 A.2d 1221, 1224 n. 1 (Me.1984) (issue preserved for appeal when the defendant failed to specifically articulate a Sixth Amendment objection at the trial, but the record established the trial court considered and rejected the argument that the defendant was denied the effective assistance of counsel).

[¶ 7] The State argues the recorded statements were used properly for impeachment purposes pursuant to principles enunciated in *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), regarding the importance of truth-seeking at a trial. York argues such principles do not apply when the recorded statements were obtained in the absence of a waiver of his Sixth Amendment right to counsel at a police-initiated post-indictment questioning. We agree.

[¶ 8] The Supreme Court of the United States has allowed information that would ordinarily violate exclusionary rules to be used for impeachment purposes. *See Harvey*, 494 U.S. at 345–46, 110 S.Ct. at 1177–78 (voluntary statements obtained in violation of the Sixth Amendment prophylactic rule of *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986))[4];

**(a) Grounds of Motion.** A defendant may move to suppress as evidence any of the following, on the ground that it was illegally obtained:

(1) physical objects;
(2) statements of the defendant;
(3) test results;
(4) out-of-court or in-court eyewitness identifications of the defendant.

....

**(c) Hearing.** The court shall receive evidence on any issue of fact necessary to the decision of the motion.

**(d) Order.** If the motion is granted, the court shall enter an order limiting the admissibility of the evidence according to law. If the motion is granted or denied, the court shall

make findings of fact and conclusions of law either on the record or in writing.

....

3. *See State v. Clark*, 483 A.2d 1221, 1224 (Me. 1984) (citing *United States v. Henry*, 447 U.S. 264, 269, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980) and *State v. Moulton*, 481 A.2d 155, 159 (Me.1984), *aff'd, Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) ("[The right to the effective assistance of counsel] attaches ... from arraignment on.")).

4. The *Jackson* rule requires that once a defendant invokes the right to counsel, any waiver of that right, even if voluntary, knowing and intelligent, is presumed invalid if provided during a

*Harris,* 401 U.S. at 226, 91 S.Ct. at 646 (voluntary statements obtained in violation of the Fifth Amendment[5] prophylactic rules embodied in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *Walder,* 347 U.S. at 65, 74 S.Ct. at 356 (evidence obtained in violation of the Fourth Amendment[6]). Although the information may not be used in the prosecution's case-in-chief, the exclusionary rules may not be used by the defendant as a license to take the stand and lie with impunity. *See Harvey,* 494 U.S. at 351, 110 S.Ct. at 1180–81; *Harris,* 401 U.S. at 224–25, 91 S.Ct. at 645–46; *Walder,* 347 U.S. at 65, 74 S.Ct. at 356. Thus, when the defendant testifies, information obtained in violation of the Fourth Amendment, or information obtained in violation of the prophylactic rules designed to protect rights embodied in the Fifth and Sixth Amendments, may be used for impeachment. *See id.* This is so because the use of the information is not itself a constitutional violation.

[¶ 9] Nevertheless, the Supreme Court has concluded that when the offering of such evidence amounts to a constitutional violation itself the evidence may not be used for any purpose. *See New Jersey v. Portash,* 440 U.S. 450, 458–59, 99 S.Ct. 1292, 1296–97, 59 L.Ed.2d 501 (1979) (involuntary statements may not be used at trial for any purpose because use of the statements would violate the Fifth Amendment); *Mincey v. Arizona,* 437 U.S. 385, 401–02, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978) (same). This is precisely what occurred in the instant case. York's Sixth Amendment right to counsel had attached and he did not waive this right before

speaking with Perro. *See United States v. Spencer,* 955 F.2d 814, 820 (2d Cir.1992) ("[I]n the absence of a later waiver of the initially invoked right to counsel, any subsequent statement transgresses the core constitutional right to counsel, rather than a judicially created prophylactic rule for the protection of that right, and therefore should not be available to the prosecution for any purpose."). York's right to counsel was violated when the State used the recorded information at the trial to impeach his testimony. *See Maine v. Moulton,* 474 U.S. 159, 173, 106 S.Ct. 477, 485, 88 L.Ed.2d 481 (1985) (quoting *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964) ("[Massiah] was denied the basic protections of [the right to have the assistance of counsel] when there was used against him at the trial evidence of his own incriminating words, that federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.") (alterations in original)).[7]

[¶ 10] The State argues the trial court's error is harmless, contending that York's guilt was established amply by the State's case-in-chief, and that York's credibility was otherwise well impeached. York argues the use of the recorded information was critical in that it both impeached his testimony and bolstered the testimony of Perro, a witness whose story had changed repeatedly. We agree.

[¶ 11] Pursuant to the harmless error analysis we review the entire record as a whole and ignore errors that are harmless, even some constitutional violations.[8] *State v.*

discussion initiated by police. *Jackson,* 475 U.S. at 636, 106 S.Ct. at 1411.

5.  The Fifth Amendment states: "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V.

6.  The Fourth Amendment states: "The right of the people to be secure ... against unreasonable searches and seizures, shall not be violated, ... but upon probable cause...." U.S. Const. amend. IV.

7.  Unlike the Fifth and Sixth Amendments which are violated only when certain kinds of evidence is introduced at trial, the Fourth Amendment is

violated before trial. We permit the limited use of the fruits of a Fourth Amendment violation for impeachment purposes, but we never countenance for any purpose a violation of either the 5th or 6th Amendment in open court.

8.  The constitutional deprivation in this case is subject to a harmless error analysis. *See Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (improper admission of a confession made to an undercover officer in violation of the defendant's right to counsel); *See also Arizona v. Fulminante,* 499 U.S. 279, 307–10, 111 S.Ct. 1246, 1263–65, 113 L.Ed.2d 302 (1991) (While harmless error does not apply when the constitutional violation is a "structural defect[ ]

*Begin,* 652 A.2d 102, 105 (Me.1995). "We will not set aside an otherwise valid conviction if we 'may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.'" *State v. Hassapelis,* 620 A.2d 288, 293 (Me. 1993) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)).

[¶ 12] Much of the State's case hinged on the credibility of Perro, an important witness whose story had changed on three occasions. The anonymous phone call, received by police on the day before the fire, resulted from information supplied by Perro.[9] The testimony of Perro's girlfriend, Susan Dyer, that York wanted to burn his trailer and that he offered Perro money to do it, resulted from a discussion with Perro. Similar testimony offered by Joel York, the defendant's cousin, also was based on a discussion with Perro. Use of the recorded information served to bolster the credibility of Perro, and, in turn, bolster the testimony of the other witnesses whose testimony was based on Perro's version of events. Moreover, it is likely the jury's verdict in this case was also based, at least in part, on the lack of credibility of York's testimony denying the charge. While York's credibility may have been attacked with some success on cross-examination,[10] it was the use of the recorded information that seemed likely to have significantly impeached York's credibility. The State also used the recorded conversation to establish that York was cognizant of his own guilt because he never asked Perro to tell the truth, nor did he speculate with Perro about who may have started the fire. In light of the fact that the recorded information not only impeached York, but bolstered the testimony of several prosecution witnesses, it cannot be said with confidence that the use of such information was harmless beyond a reasonable doubt.

[¶ 13] Because we vacate the conviction, we neither reach nor comment on York's other contentions regarding whether the trial court abused its discretion in allowing admission of York's prior convictions for burglary, theft, and possession of a firearm by a felon, or alternatively, whether the court abused its discretion in denying him an opportunity to explain the convictions once admitted.

The entry is:

Judgment vacated. Remanded for proceedings consistent with the opinion herein.

---

in the construction of the trial mechanism" that affects "the entire conduct of the trial from beginning to end," harmless error is applicable when the violation is merely a "trial error"—"error that occurred during presentation of the case to the jury, and that may therefore be qualitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.").

9. The anonymous caller was York's cousin-in-law, Janice York, who knew of the impending fire because of information supplied by Perro.

10. On the day of the fire, York told Ellis that he had been smoking in the trailer before leaving that morning. On cross-examination, York denied telling Ellis he was a smoker or had been smoking. On direct York claimed to have seen an ashtray containing two cigarette butts in the trailer on the morning of the fire, but did not mention the ashtray to Ellis when interviewed shortly after the fire. York also stated he left the trailer at about 11:00 a.m. on the day of the fire. York's neighbors, Richard and Lynn King, testified York left the trailer about 15 to 30 minutes prior to Richard seeing smoke coming from York's trailer at about 11:30 or 11:45 p.m. Richard King also testified, however, that he noticed the smoke about 10 to 15 minutes before calling the fire department. The call was placed at 12:38 p.m. Finally, on cross-examination York's ability to account accurately for his time on the day of the fire was poor.